UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN M. FITZAK,

        Plaintiff,

   v.

ANTHONY J. ANNUCCI, *et al.*,

        Defendants.

_____

21-CV-298-LJV
DECISION & ORDER

On February 25, 2021, the *pro se* plaintiff, John M. Fitzak, commenced this action under 42 U.S.C. § 1983 and the New York Labor Law ("Labor Law"). Docket Item 1. The defendants then moved to the dismiss the complaint, Docket Item 6, and on September 22, 2021, this Court granted the motion to dismiss in part, Docket Item 11. More specifically, this Court dismissed Fitzak's official-capacity claims for money damages as well as his Labor Law claims, but it granted Fitzak leave to amend his remaining claims to correct the deficiencies noted in the Court's decision. *Id.* at 11-12.

On November 10, 2021, Fitzak filed an amended complaint alleging that the defendants retaliated against him in violation of his rights under the First Amendment.[1]

---

[1] The amended complaint also alleges that the defendants retaliated against Fitzak in violation of the New York Labor Law. *See* Docket Item 12 at ¶ 25. Presumably, that allegation was an oversight in amending the complaint because Fitzak does not refer to the Labor Law elsewhere in the amended complaint. *See* Docket Item 12. Moreover, this Court already dismissed Fitzak's Labor Law claims with prejudice because the Court does not have subject matter jurisdiction over those claims. *See* Docket Item 11 at 9-11. The Court therefore will not address in detail any Labor Law claims in this decision. To the extent that the amended complaint alleges a retaliation claim under the Labor Law, it is dismissed for all the reasons stated in this Court's prior decision. *See id.*

Docket Item 12.  A month later, the defendants moved to dismiss the amended

complaint.  Docket Item 13.  On January 4, 2022, Fitzak responded, Docket Item 15,

and two weeks later, the defendants replied, Docket Item 16.  On February 10, 2022,

Fitzak moved for leave to file a surresponse.  Docket Item 17.  A short time after the

Court granted that motion, Docket Item 18, Fitzak filed his surresponse, Docket Item 19.

    For the following reasons, the defendants' motion to dismiss is granted and the

case is closed.

## FACTUAL BACKGROUND[2]

Fitzak has sued Anthony J. Annucci, Acting Commissioner of the New York

Department of Corrections and Community Supervision ("DOCCS"); Jason D. Effman,

Associate Commissioner of DOCCS; and James O'Gorman, Deputy Commissioner of

DOCCS, for alleged violations of Fitzak's rights under the First and Fourteenth

Amendments.  *See* Docket Item 12.  The amended complaint tells the following story.

Fitzak is employed as a corrections officer at Orleans Correctional Facility

("Orleans").  *Id.* at 1.  On March 1, 2018, he consented to an interview with Auditor

Barbara King from Akron, Ohio, as a part of a Prison Rape Elimination Act ("PREA")

---

[2] On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)).  The court also may consider any written documents that are attached to the complaint, incorporated by reference, or integral to it.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  Fitzak attached several documents to the amended complaint, *see* Docket Items 12 at 7-31, and this Court therefore considers those documents.

compliance audit.[3]  *Id.* at ¶ 8.  To prepare for the audit, management at Orleans

provided Fitzak and other staff with "a packet of possible questions" that might be asked

in the audit interviews and "the appropriate responses" to those questions.  *Id.* at ¶ 10;

*see also id.* at 8-17 (question packet).

At the start of Fitzak's interview, King stated that "she was an independent

auditor, [that] she had no connections to [Orleans] or to [DOCCS]," and that the

"interview was voluntary . . . and . . . confidential."  *Id.* at ¶ 11.  King also said "that there

would be no names or identifiers of who was interviewed and . . . no repercussions or

retaliation for talking to her."  *Id.* at ¶ 12.  The interview included questions about

DOCCS's policy towards sexual abuse and sexual harassment and the training that

officers received regarding sexual abuse and harassment.  *Id.* at ¶ 13; *see also id.* at 8-

17.

During the interview, King asked Fitzak what he thought "would cause an inmate

to be a victim of sexual abuse or sexual harassment."  *Id.* at ¶ 14.  Based on his twenty-

---

[3] Congress enacted PREA for multiple purposes, including to "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States," to "develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape," and to "increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape."  34 U.S.C. § 30302.  As a part of PREA, Congress conditioned certain federal funding on a state's agreement to conduct PREA compliance audits for all "prisons under the operational control of the executive branch of the State" every three years.  *Id.* § 30307(e)(2); *see also* 28 C.F.R. § 115.401(a) ("During the three-year period . . . the agency shall ensure that each facility operated by the agency, or by a private organization on behalf of the agency, is audited at least once.").  A PREA compliance audit assesses and documents "whether agency-wide policies and procedures comply with relevant PREA standards."  28 C.F.R. § 115.403(b).

plus years of experience working in corrections, Fitzak responded "that 95% of sexual activity was probably consensual . . . ; 3% could probably be attributed to karma, in that inmates today have the ability to get more information from the outside, through family and friends, in order to find out about other inmates' crimes" (the "karma statement"); and "that the remaining 2% could possibly be a combination of both scenarios that ended up going to[o] far and became a criminal offense."  *Id.* at ¶ 15.

In saying that three percent probably could be "attributed to karma," Fitzak "in no way suggested nor defended this type of behavior as being appropriate."  *Id.*  Indeed, Fitzak "does not believe that any form of sexual misconduct is condonable, whether 'on the street' or inside ***any*** type of facility."  *Id.* (bold and emphasis in original).  He simply said "karma" as a "way to state that one's actions, whether good or bad, have corresponding reactions."  *Id.*  In other words, what Fitzak meant by the karma statement is that upon a prisoner's finding out the basis for another prisoner's incarceration, "some inmates may decide to exact their own form of justice."  *Id.*

But Orleans officials viewed Fitzak's karma statement differently.  They characterized it as an "assert[ion] that inmates get what they deserve when they have been subject to sexual abuse."  *Id.* at 25.

The day after the interview, a local union official advised Fitzak that Fitzak "was being 'locked out,' [i.e.] suspended without pay" and would be "issued a notice of discipline."  *Id.* at ¶ 16 (capitalization omitted).  Later that same day, another union official contacted Fitzak and clarified that those actions were being taken because of Fitzak's karma statement and because Fitzak's interview "was the worst one that Auditor King had ever conducted."  *Id.* at ¶ 17.

Fitzak was never issued a notice of discipline.  Instead, on March 5, 2018, the very next business day, Orleans Facility Captain E. Raczkowski issued Fitzak "a Formal Counseling."  *Id.* at ¶ 21; *see also id.* at 25 (formal counseling).  The formal counseling stated that Fitzak's karma statement "could have been construed to undermine [DOCCS's] efforts to comply with federal law governing PREA during an audit being conducted at Orleans"; it directed Fitzak "to immediately attend PREA [t]raining in an effort to educate [him] about the law and DOCCS['s] policy."  *Id.* at 25.  The formal counseling also stated that the "counseling [was] not meant to be personal or derogatory in nature but rather [was] meant to point out possible shortcomings in [Fitzak's] job performance and ways in which [he] may improve them."  *Id.*

Fitzak received this formal counseling because King breached the promised confidentiality of the PREA audit interview.  *Id.* at ¶ 21.  In response to King's breach of confidentiality, Fitzak filed a formal complaint against King with the United States Department of Justice.  *Id.* at ¶ 22; *see also id.* at 27 (complaint).[4]

## **LEGAL PRINCIPLES**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[4] Fitzak has not sued King in this action, and the Court therefore neither expresses nor implies any opinion about the viability of any claim against her.

misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### DISCUSSION

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

## I.    PERSONAL INVOLVEMENT

In this Court's prior decision, the Court reminded Fitzak that in amending his section 1983 claims, "liability under section 1983 may attach only upon a showing that a party was personally involved in causing the claimed injury."  Docket Item 11 at 7 n.2 (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)).  As explained in this Court's prior decision, to establish liability against a defendant under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (citing *Iqbal*, 556 U.S. at 676).  It is not enough to assert that the defendant is a "link[] in the prison['s] chain of command." *See McKenna v. Wright*, 386 F.3d 432, 437

(2d Cir. 2004).  Moreover, the theory of *respondeat superior* is not available in a section 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  Instead, "[t]he violation must be established against the supervisory official directly."  *Tangreti*, 983 F.3d at 618.  In other words, the official must be personally involved.  *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) ("Proof of an individual defendant's personal involvement in the alleged wrong is . . . a prerequisite to his liability on a claim for damages under § 1983.").

Fitzak alleges that his First Amendment rights were violated when Facility Captain Raczkowski issued him a formal counseling because of Fitzak's statements during the PREA interview.  *See* Docket Item 12 at ¶¶ 21, 24.  But he says very little about how the named defendants—Annucci, Effman, and O'Gorman—were personally involved in the alleged constitutional violations.  Although Fitzak alleges that upon "information and belief," the PREA "interviews were done in cooperation with the [o]ffices of the [d]efendants," *see id.* at 1, he has not pleaded anything about how the defendants were personally involved in issuing the formal counseling—the alleged retaliatory act that is the gravamen of his claim.  Indeed, Fitzak has not alleged that the defendants even knew about Fitzak's selection for an interview, his responses during the interview, or his subsequent formal counseling.[5]

---

[5] In Fitzak's response, he also "contends that" PREA Auditor King "contacted" Effman "immediately after [Fitzak's] interview concluded."  *See* Docket Item 15 at 6. Fitzak raises this allegation for the first time in his response.  Normally, a court "will not consider [] factual allegations raised for the first time in a brief in opposition to a motion to dismiss."  *Harrell v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2019 WL 3817190, at *2 n.3 (S.D.N.Y. Aug. 14, 2019).  But even considering that allegation, Fitzak still has not pleaded that Effman was personally involved in the alleged constitutional violations because he still does not allege that Effman was involved in issuing the formal counseling—or any other action adverse to Fitzak for that matter.

In his response to the defendants' motion, Fitzak argues that under various DOCCS directives, the offices of the defendants have authority over disciplinary matters and that they therefore were personally involved. *See* Docket Item 15 at 5-6.  But asserting that the defendants are the final "link[] in the prison['s] chain of command" is insufficient to plead personal involvement. *See McKenna*, 386 F.3d at 437.  So the defendants "may not be held liable for damages for constitutional violations merely because [they] held . . . high position[s] of authority" at DOCCS. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

Because Fitzak has not pleaded that the defendants were personally involved in issuing the formal counseling or taking any other action adverse to him, his First Amendment claim under section 1983 is not viable.[6]

---

[6] The original complaint also alleged that the defendants violated Fitzak's right to due process under the Fourteenth Amendment.  Docket Item 1 at 4.  Fitzak appears to abandon his due process claim in the amended complaint. *See* Docket Item 12.  The amended complaint does not mention due process, *see id.*, nor does it mention the Fourteenth Amendment except for one reference in the first paragraph of the amended complaint and another reference in final paragraph. *See id.* at ¶ 25.  To the extent that the failure to include the due process claim was an oversight and Fitzak intended to continue pursuing his due process claim, that claim is not viable because Fitzak has not pleaded that the defendants were personally involved in any alleged deprivation of a property interest.

Moreover, Fitzak has not alleged facts to sufficient to show that he was deprived of any property interest. *See* Docket Item 11 at 8-9 (explaining the requirements for due process claim).  Although he alleges that he received a formal counseling, was locked out of the facility for some time, and would be (but never was) issued a notice of discipline, Fitzak does not allege that he actually was suspended and, if so, for how long or how much pay he lost. *See* Docket Item 12 at ¶¶ 16, 21.  In fact, it seems that Fitzak was not suspended at all—or for at most a couple days—given that the union told him he was "locked out" on a Friday but that he received the formal counseling the following Monday. *See id.*

## II.   RETALIATION (FIRST AMENDMENT)

Even if Fitzak had alleged the defendants' personal involvement in retaliating against him, he still would fail to state a First Amendment retaliation claim because he has not plausibly alleged that he engaged in protected speech.  To establish a claim for retaliation under section 1983, a plaintiff must show that (1) he engaged in constitutionally protected speech or conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected speech or conduct and the adverse action.  *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009).

The Second Circuit "and the Supreme Court have long recognized that 'the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.'"  *Shara v. Maine-Endwell Cent. Sch. Dist.*, 2022 WL 3452280, at *2 (2d Cir. Aug. 18, 2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).  "When acting as an employer," however, "'the State has interests . . . in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'"  *Piscottano v. Murphy*, 511 F.3d 247, 268-69 (2d Cir. 2007) (alteration in original) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering,* 391 U.S. at 568.

"[I]n assessing the first prong of the retaliation test—whether a public employee's speech is protected—[a court] must consider 'two separate subquestions': (1) whether the employee 'spoke as a citizen rather than solely as an employee,' and (2) whether he

spoke on 'a matter of public concern.'" *Shara*, 2022 WL 3452280, at *2 (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)). "If the answer to either question is no," the inquiry ends there because the employee has not engaged in protected speech. *Matthews*, 779 F.3d at 172. "If, however, both questions are answered in the affirmative, [a] court then" considers whether the employer "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Id.*

"[T]he critical question" in determining whether an employee speaks as a citizen is "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Montero v. City of Yonkers*, 890 F.3d 386, 397-98 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). To answer that question, courts consider "'the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two,' along with other contextual factors such as whether the plaintiff's speech 'was also conveyed to the public.'" *Shara*, 2022 WL 3452280, at *3 (quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012)). Moreover, a public employee's speech "can be pursuant to" his "official job duties even though it is not required by, or included in, [his] job description, or in response to a request by the employer." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010) (internal quotation marks omitted). "Although relevant inquiries, neither the form of a public employee's communication nor to whom the communication was directed is dispositive of whether the communication was made pursuant to the employee's official duties." *Brown v. Off. of State Comptroller*, 456 F. Supp. 3d 370, 391 (D. Conn. 2020).

Fitzak has not plausibly alleged that he made the karma statement in his capacity as a citizen.  Indeed, the amended complaint suggests the opposite—that Fitzak's remarks were made in his role as a corrections officer.  He alleges that the interview was a part of a PREA compliance audit of Orleans and that the purpose of the audit was to "assess . . . knowledge of [PREA] and to provide and/or gather any information that could be utilized to effectively eliminate prison rape."  Docket Item 12 at ¶¶ 8, 9 (emphasis removed).  Although he alleges that King was an independent auditor, *id.* at ¶ 11, Fitzak also says that the interviews and audit were done in connection with DOCCS and his work at Orleans, *see id.* at 1.[7]  What is more, Fitzak alleges that *Orleans prepared staff* for the PREA audit by providing "possible questions and the appropriate responses."  Docket Item 12 at ¶ 10; *see also id.* at 8-17.

In short, part of the employment duties for Orleans staff, including Fitzak, on March 1, 2018, was to prepare to meet with the PREA auditor and to answer questions about PREA and Orleans's compliance with it.  Therefore, during his PREA interview, Fitzak answered the auditor's questions as an Orleans employee and not as a private citizen.  *See Brown*, 456 F. Supp. 3d at 394 (D. Conn. 2020) (finding that statements made during a routine audit of a government agency were not protected speech because "for employees at the [agency], part of their job on July 30 was to meet with the Auditors, if the Auditors asked").

---

[7] Although an auditor must be independent and an audit cannot be conducted by someone affiliated with the agency, the agency, in this case DOCCS, bears the responsibility for ensuring that a PREA compliance audit occurs every three years and may do so by contracting with a certified PREA auditor for only that purpose.  *See supra* at 3 n.3; 28 C.F.R. § 115.401(a).

Because Fitzak has not pleaded that he spoke as citizen, he has not alleged that his statements were protected under the First Amendment.[8]  His First Amendment retaliation claim therefore is not viable not only because Fitzak has not pleaded the defendants' personal involvement but for that reason as well.[9]

## **CONCLUSION**

For the reasons stated above, the defendants' motion to dismiss, Docket Item 13, is GRANTED, and the amended complaint, Docket Item 12, is dismissed.  The Clerk of the Court shall close the file.


SO ORDERED.

Dated:        September 22, 2022
              Buffalo, New York


                                          /s/ Lawrence J. Vilardo
                                         LAWRENCE J. VILARDO
                                         UNITED STATES DISTRICT JUDGE

---

[8] To the extent that Fitzak presses a stand-alone free speech claim in addition to his retaliation claim, that claim is not viable for the same reason—he has not alleged that he engaged in constitutionally protected speech.  *See Piscottano*, 511 F.3d at 270 ("[A] threshold question" to a state employee's First Amendment claim is "whether the employee's expressive conduct was speech *as a citizen* on a matter of public concern." (emphasis added)).

[9] The defendants also argue that even if Fitzak stated a viable First Amendment claim, the defendants are entitled to qualified immunity. *See* Docket Item 13-1 at 18-22. Because the Court finds that Fitzak has not stated a viable First Amendment claim, it need not and does not reach that argument.